Judge Pauley

09  CV  6583

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONSUMER ELECTRONICS ASSOCIATION,
INFORMATION TECHNOLOGY INDUSTRY
COUNCIL, and ITAC SYSTEMS, INC.,

                  Plaintiffs,

      v.

CITY OF NEW YORK, MICHAEL R. BLOOMBERG,
in his official capacity as Mayor of the City of New
York, NEW YORK CITY DEPARTMENT OF
SANITATION, JOHN J. DOHERTY, in his official
capacity as the Commissioner of the Department of
Sanitation, and ROBERT LANGE, in his official
capacity as Director of Waste Prevention, Reuse and
Recycling of the Department of Sanitation,

                  Defendants.



09 Civ

**COMPLAINT**

Plaintiffs Consumer Electronics Association, Information Technology Industry Council,

and ITAC Systems, Inc., for their Complaint hereby allege as follows:

## INTRODUCTION

1.    Plaintiffs are two major trade associations and a company that are damaged by

recently enacted City of New York ("City") laws and regulations for managing electronic waste

("E-waste") that are arbitrary, capricious, illegal, and unconstitutional, and impose crushing costs

and excessive burdens on Plaintiffs. Plaintiffs agree with Defendant Mayor Bloomberg, who

vetoed part of this law, declaring that the law was illegal and unconstitutional (the veto was later

overridden). Plaintiffs now seek preliminary and permanent injunctive relief and damages from

the illegal E-waste program, which exceeds the authority of the City of New York to regulate

interstate commerce. Although the E-waste Program purports to regulate in the City of New

York only, the E-waste Program in fact has an extraterritorial reach that controls manufacturers'

conduct beyond the boundaries of City and imposes liability for electronic goods sold long ago by other manufacturers. A preliminary injunction is critical to bar a July 31, 2009 deadline that mandates Plaintiffs' member companies to, among other things, submit plans to directly collect and recycle E-waste from every City resident, at each company's sole cost and expense, regardless of the connection of the company to the old equipment or its current owner. Plaintiffs also ask that the City be ordered to conduct adequate environmental reviews for a program of this scope, as required under state and City laws, which were effectively ignored by the City in its haste to enact a new program for electronic waste.

2.    Plaintiffs constitute the consumer electronics industry, which is committed to and has great experience recycling electronic products in jurisdictions world-wide and has worked successfully with many governmental entities to craft sustainable and effective E-waste programs. Many of the industry's leading companies have well-publicized, nationwide "take-back" programs in place whereby members of the public can return used electronics products to manufacturers to ensure proper management, recycling and reuse.

3.    Information technology ("IT") and consumer electronics manufacturers also participate in 19 mandatory take-back programs in states throughout the United States. In addition, Plaintiffs are meeting mandatory take-back requirements throughout the European Union and in Japan. Upon information and belief, however, New York City is the first municipality to impose a mandatory E-waste law. While each of the other state programs imposes some burdens on manufacturers, none remotely approaches the draconian level of burdens that New York City's E-waste program imposes on Plaintiffs. Working in some cases directly and in other instances through the trade associations, Plaintiffs attempted over the last

2

several years to work with the City to develop a reasonable and effective recycling program, but their suggestions were rejected and efforts at dialogue and negotiation rebuffed.

4.      The New York City E-waste program (hereinafter, the "E-waste Program") that is the subject of this lawsuit is comprised of (i) two laws enacted by the City Council in 2008 (Local Laws 13 and 21, collectively the "E-waste Law"); (ii) rules finalized on April 15, 2009, by the Department of Sanitation ("E-waste Rules") to implement the E-waste Law; and (iii) E-waste plan submission materials issued on or about the same time as the E-waste Rules directing Plaintiffs and hundreds of companies to file by July 31 detailed plans and commitments to implement the E-waste Law and its regulations.  The E-waste Program imposes mandates worldwide on any person involved in the manufacture, assembly, branding, licensing, or sale of a vast array of electronic goods sold at any time in the City or sold at other locations and brought into the City by current or past owners, excluding only a modest number of retail outlets.  These persons are all labeled "manufacturers" under the E-waste Program.

5.      The E-waste Program requires that these manufacturers build an unprecedented waste management infrastructure and deploy personnel and resources to directly collect electronic waste from any resident in the City for free, including directly retrieving from residences old televisions, computers, monitors, printers, and many other electronic devices greater than 15 pounds.  For electronic items 15 pounds or less, the manufacturers are individually responsible for establishing drop-off points for the equipment, or establishing a program for the packaging and mail-back of the electronic equipment solely at the manufacturer's expense.  If the manufacturer wants to rely solely on the drop-off option for these "smaller" items, it must provide at least 59 drop-off locations across the City.

6.    The E-waste Program imposes joint and several, retroactive liability on the Plaintiffs and hundreds of other businesses around the globe whose electronic equipment ends up in New York City.  By July 31, Plaintiffs and other manufacturers must certify which companies are responsible for which brands of electronic goods, an impossible task from a legal, logistical and business perspective, because many companies can be "responsible" for the same covered device given the law's excessively broad definition of "manufacturer."  In addition, many brands of televisions and other electronic equipment have passed through multiple owners over the last thirty years or more.

7.    As the E-waste Program is implemented over the next two years, it will require manufacturers to retrieve the equipment they sold, or, at times, their competitors' equipment, simply upon a phone call or email request from a City resident.  By 2011, Plaintiffs and other manufacturers will be required to retrieve "orphan waste" that is of the "type" the manufacture sells or sold, upon the request of a City resident, regardless of origin and regardless of whether the manufacturer makes a new sale or still manufacturers, assembles, licenses, brands or sells that "type" of equipment.

8.    The E-waste Program is enforced against manufacturers through an array of fees, fines, penalties, and mandatory performance standards.  By 2012, each manufacturer must retrieve a volume of electronic waste in the City equal to 25% of the volume (by weight) it sells in the City.  The requirement grows to 65% by 2018, and has no rational relationship to the life span of electronic goods or the impossibility of calculating manufacturer quotas due to the fact that few of the covered manufacturers have the ability to calculate their "sales," if any, to New York City residents.  These targets are completely arbitrary in that they mistakenly assume a manufacturer has the ability and legal authority to require equipment owners to relinquish

ownership of their equipment. Yet, a manufacturer that fails to meet a performance standard will be subject to a $50,000 penalty for each percentage point that the manufacturer falls below the standard.

9.     A manufacturer that fails to retrieve or accept for return a piece of covered electronic equipment is subject to a $2,000 penalty for each piece of equipment. Thus, a product that a manufacturer sold years ago at some fraction of this amount could result in a $2,000 penalty being imposed years later. Astonishingly, this penalty even extends to situations where a manufacturer fails to retrieve or accept orphan waste, which it never manufactured, owned, sold, or controlled, let alone profited from by putting it into commerce. A manufacturer that fails to submit a required E-waste plan on July 31 or annual reports thereafter is subject to a penalty of $1,000/day.

10.     The retrieval requirements imposed on Plaintiffs extend beyond City residents and include all City businesses, non-profits, and government agencies. For these office locations, manufacturers must provide services to collect and/or accept electronic waste that "must be at least reasonably accessible." Manufacturers are barred from charging any fees for this work, with the sole exception of for-profit companies with over fifty employees.

11.     The E-waste Program's burdens are being suffered now by Plaintiffs and will come to a head on July 31, 2009, when Plaintiffs and other manufacturers must submit and certify "E-waste plans" to somehow implement the mandates. Among many other requirements set forth in the City's forms for the E-waste plans, the manufacturers must identify the specific contractors, personnel, and methods they will use to begin retrieving electronic goods across the City. They must also identify details regarding service provider contracts (including start and

end dates), the fate and destination of the collected goods, and how their recycling will comply with all City, state, and federal laws.

12.    The E-waste Program is not environmentally responsible, as the City could have and would have discovered had it complied with New York State and City laws by conducting an appropriate environmental impact review.  The Department of Sanitation ("Department") effectively wrote itself out of the program when it adopted the E-waste Rules, placing all collection, management and recycling/reuse burdens solely on manufacturers.  Despite its extensive existing infrastructure and workforce, and its traditional role with respect to the collection of waste in the City, the Department literally has no further obligation to even facilitate the collection of these used products.  Instead, retrieving more than 3,000 electronic devices per day will require hundreds of new trucks on City streets, increasing traffic congestion and exacerbating air and noise pollution and releasing additional carbon-dioxide emissions (which is totally at odds the goals of the Mayor's congestion pricing proposal.  *See* http://www.nyc.gov/html/planyc2030/html/plan/transportation_congestion-pricing.shtml (last visited July 23, 2009).  In contrast, residents and businesses currently bring electronics to voluntary recycling collection centers, or place them curb-side for pick up by Department of Sanitation.  This practice is now prohibited under the new program.

13.    Plaintiffs and other manufacturers estimate that their damages from the City's illegal E-waste Program will exceed $200 million per year.  The costs of the direct collection requirement of the City's E-waste Program are projected to be, on a per pound basis, 10 times more expensive than the total cost of collection and recycling of other e-waste programs in California and Maine.  This is because the burden of the E-waste Program rests entirely on the shoulders of manufacturers, and requires them to implement direct collection methods at

residences. The City has enacted an E-waste regulatory scheme that departs dramatically from programs embraced by other state governments by imposing a direct collection obligation on manufacturers. Even in the states where manufacturers are required to take on the primary role in managing E-waste, they are granted sufficient flexibility in how they implement the program, so as to avoid the extraordinarily excessive burdens that the City's E-waste Program imposes on interstate commerce. No other take-back program anywhere in the world has ever mandated the approach currently taken by the City. Indeed, the City itself, with an unparalleled and extensive waste collection infrastructure already in place, stated publicly last year on the Department of Sanitation's website that for the City to operate this type of program would be cost prohibitive: "Due to high labor and transportation costs, it is cost prohibitive to collect [electronic equipment] directly from homes." *See* DSNY Website, http://home2.nyc.gov/html/nycwasteless/html/recycling/electronicsfaq.shtml (last visited July 17, 2008). (As explained below, by July 28, 2008, this language was removed from the Department's website shortly after a City official was told of its existence.)

14.    The E-waste Program discriminates against out-of-state manufacturers that lack facilities in the City to accommodate the collection process. The program is therefore *per se* illegal under the dormant Commerce Clause. The City's E-waste Program also violates the dormant Commerce Clause because the burdens imposed by the program on interstate commerce far outweigh the local benefits to City residents, by, among many others things, mandating that manufacturers collect used electronics directly from residents' homes at a cost to be borne solely by manufacturers and eventually passed along to consumers everywhere in the form of higher product prices. Thus, consumers everywhere will end up subsidizing the unprecedented costs of New York City's program.

15.     Similarly, the City's targeted and excessive regulation of only manufacturers of certain electronic equipment while excluding from any regulation manufacturers of other types of electronic equipment and "bulky" wastes (such as appliances) that contain the same materials that the City claims can harm the public health and welfare, violates Plaintiffs' right to equal protection under the Fourteenth Amendment.  Defendants' imposition of joint and several and retroactive liability on manufacturers also violates manufacturers' constitutional rights under the Due Process, Takings, and Contracts Clauses of the United States Constitution.  Under 42 U.S.C. § 1983, in addition to being entitled to injunctive relief against the City's E-waste Program, Plaintiffs are entitled to damages and an award of attorneys' fees as a result of these constitutional violations.

16.     Defendants also violated state law because the E-waste Rules are arbitrary and capricious and were formulated and adopted without any rational basis.  Defendants' far reaching regulation of manufacturers' conduct beyond the jurisdictional boundaries of New York City exceeds the City's police power authority.  Lastly, Defendants failed to adequately consider and address the potential environmental impacts of the E-waste Program, and specifically the mandates set forth in the E-waste Rules and the E-waste plan forms, in violation of the State Environmental Quality Review Act ("SEQRA") and the City's counterpart environmental review law, the City Environmental Quality Review ("CEQR").

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (section 1983 jurisdiction) and 28 U.S.C. § 2201 (declaratory judgment).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  Jurisdiction also lies pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because there is complete diversity between the parties and damages exceed $75,000.00.

18.     For purposes of the declaratory relief sought in this Complaint, an actual case or controversy exists between Plaintiffs and Defendants as a result of New York City's enactment of Local Laws 13 and 21, and the Department of Sanitation's promulgation of rules pursuant thereto, and implementation thereof.  Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and related preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 65, including a temporary restraining order.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

20.     Plaintiff Consumer Electronics Association ("CEA") is a leading trade association comprised of over 2,200 companies within the United States' consumer technology industry. CEA members lead the consumer electronics industry in the development, manufacturing, and distribution of audio, video, mobile electronics, communications, IT, multimedia, and accessory products, as well as related services that are sold through consumer channels.  Members range from multi-national corporations to small, specialty niche companies.  CEA is actively involved, on behalf of its members, with electronics equipment take-back programs around the country. CEA is organized under the laws of the Commonwealth of Virginia.

21.     Plaintiff Information Technology Industry Council ("ITI") is a 93-year-old trade association comprised of 42 companies.  Its members consist of leading manufacturers and suppliers of computers, telecommunications, business equipment, software, and IT services.  ITI has established an Environmental Leadership Council which represents almost 70 of the principal manufacturers of IT equipment, wireless, and consumer electronics devices, and other electronics and high-tech equipment.  These companies are leaders in innovation and sustainability and are at the forefront of voluntary product stewardship efforts.  ITI represents its

membership across the country and internationally with respect to used electronics equipment take-back programs. ITI is organized under the laws of the State of Delaware.

22.    CEA and ITI have standing to bring their claims because their respective members would otherwise have standing to sue in their own right, the interests CEA and ITI seek to protect are germane to CEA's and ITI's purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in this lawsuit.

23.    Plaintiff ITAC Systems, Inc. ("ITAC") is a small electronics manufacturing company based in Garland, Texas. ITAC designs, manufactures, and markets MOUSE-TRAK high-performance computer input devices used in manufacturing process control, transaction processing, and medical systems, as well as computer graphics, engineering, and government markets. ITAC is incorporated under the laws of the State of Texas.

24.    Defendant City of New York is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York City Council, the Office of the Mayor and the Department of Sanitation, was and is responsible for enacting and adopting the E-waste Law, and promulgating E-waste Rules thereunder, and enforcing these laws, rules, and the E-waste Program challenged in this case.

25.    Defendant New York City Department of Sanitation ("Department" or "DSNY") is an administrative agency of the City, established under Chapter 31 of the New York City Charter. Defendant DSNY was and is responsible for implementing the E-waste Law, promulgating and implementing the E-waste Rules, creating the E-waste Plan forms, and implementing and enforcing the E-waste Program as a whole.

26.    Defendant Michael R. Bloomberg ("Bloomberg"), being sued in his official capacity, is the Mayor and chief executive officer of the City of New York under Section 3 of the

New York City Charter. At all times relevant hereto, Defendant Bloomberg, acting as Mayor and through his oversight of and general authority over the DSNY, was and is responsible for implementing and enforcing the E-waste Law, the E-waste Rules, and the E-waste Program.

27. Defendant John J. Doherty ("Doherty"), being sued in his official capacity, is the Commissioner of DSNY. At all times relevant hereto, Defendant Doherty was and is responsible for implementing and enforcing the E-waste Law, and formulating, adopting, implementing, and/or enforcing the E-waste Rules and E-waste Program, which is being challenged in this case.

28. Defendant Robert Lange ("Lange"), being sued in his official capacity, is the Director of Waste Prevention, Reuse and Recycling of the DSNY. At all times relevant hereto, Defendant Lange was and is responsible for implementing and enforcing the E-waste Law, and formulating, adopting, implementing, and/or enforcing the E-waste Rules and E-waste Program, which is being challenged in this case.

## FACTS

### I.   *General Background*

29. In 2006, Defendant DSNY, after a two-year process, issued a comprehensive Solid Waste Management Plan ("2006 SWMP") pursuant to Article 27 of the New York State Environmental Conservation Law ("ECL"). The 2006 SWMP established the structure of New York City's solid waste management for the next 20 years—2006 through 2025. As part of that effort, DSNY undertook a comprehensive environmental assessment of potential environmental impacts in relation to the plan pursuant to SEQRA and CEQR.

30. However, upon information and belief, neither the 2006 SWMP, nor the SEQRA/CEQR environmental assessment conducted for the 2006 SWMP, nor DSNY's findings based on that assessment, discussed or assessed any potential environmental impacts associated

with the requirements of the then-future E-waste Law, E-waste Rules, or E-waste Program at issue in this case.

31.    To the contrary, the 2006 SWMP materials merely addressed DSNY's then existing program implemented by DSNY to deal with used electronics products and made a vague reference to a possible future City Council initiative.

32.    As explained below, when the City Council enacted the E-waste Law it concluded – without any substantive analysis – that the law, which did not include a "direct collection" mandate, would not cause any adverse environmental impacts.  When DSNY subsequently exercised its discretion to promulgate rules to implement the E-waste Law, it did include a direct collection mandate, effectively forcing hundreds of additional trucks onto the streets of New York City.  Thus, the Department was independently obligated to assess the program's potential environmental impacts due to the direct collection requirement pursuant to both SEQRA and CEQR.  It failed to do so.

## II.    *NYC E-waste Program*

### A.    **Defendant Bloomberg Warns of Illegality of E-waste Law and Vetoes Portion of Law**

33.    In April and May of 2008, the New York City Council passed a two-part electronic waste recycling law, Intro 728 (which became Local Law 13) and Intro 729 (which became Local Law 21).  Initially proposed and passed by the City Council as a single bill in February 2008, the City Council broke the law into two components after Defendant Bloomberg threatened to veto and not enforce a law that he believed was illegal.

34.    At that time, Defendant Bloomberg stated unequivocally that the proposed law was "**totally illegal**" and openly opined that the "**law violates a whole bunch of federal laws on interstate commerce.**"  *See* Ray Rivera, *Mayor Calls Electronics Recycling Bill Illegal*, N.Y.

12

TIMES, available at http://cityroom.blogs.nytimes.com/2008/02/15/mayor-says-hell-ignore-veto-on-electronic-recycling/?hp (emphasis added) (last visited July 23, 2009).

35.    Defendant Bloomberg further explained:

> **The trouble with this law that the City Council passed is that you hold the manufacturers responsible for the public to recycle and the manufacturers can't do that.** They don't sell directly to the public in many cases, they sell to wholesalers, and the wholesalers, you're not holding them responsible, but also it's the individual's responsibility.

*Id.* (emphasis added).

36.    Defendant City of New York, through its City Council, completely ignored Mayor Bloomberg's admonitions, and simply broke the original bill into two components (*i.e.*, Local Laws 13 and 21), leaving all the substantive components largely unchanged. Defendant Bloomberg signed Local Law 13 into effect and vetoed Local Law 21 (the portion that established mandatory performance standards for volumes of recycling and penalties), but the veto was overridden by the City Council.

**B.    Major Provisions of the E-waste Law**

37.    The E-waste Law imposes upon only "manufacturers" the obligation to collect, handle, and recycle or reuse "covered electronic equipment" ("CEE"). The law prohibits residents from disposing of CEE as solid waste beginning on July 1, 2010. However, the burdens on manufacturers are immediate.

38.    The law's retroactive reach begins with its definition of "manufacturer":

> a person who: 1. assembles or substantially assembles, or has assembled or substantially assembled, covered electronic equipment for sale in the city; 2. manufactures or has manufactured covered electronic equipment under its own brand name or under any other brand name for sale in the city; 3. sells or has sold, under its own brand name, covered electronic equipment produced by another person for sale in the city; 4. owns a brand name that it licenses or has licensed to another person for use on covered electronic equipment sold in the city; 5. imports or has imported covered

electronic equipment for sale in the city; or 6. manufactures or has manufactured covered electronic equipment for sale in the city without affixing a brand name.

Chapter 4-A of Title 16 of the Administrative Code of the City of New York ("Code") § 16-421(g).

39.     The law defines CEE that must be collected from households as "any computer central processing unit; cathode ray tube; cathode ray tube device; keyboard; electronic mouse or similar pointing device; television; printer; computer monitor, including but not limited to a liquid crystal display and plasma screens, or similar video display device that includes a screen that is greater than four inches measured diagonally and one or more circuit boards; a laptop or other portable computer; or a portable digital music player that has memory capability and is battery powered." Code §16-421(d).  Accordingly, CEE likely includes millions of pieces of electronic equipment that are found in a large majority of New York City homes, offices, and other buildings.

40.     The City Council curiously excluded from the definition of CEE a variety of products such as microwaves, ovens and other household appliances even though these types of products contain the same materials that the City Council professed to be concerned about when it adopted the law.  Code § 16-421(d).

41.     The E-waste Law requires a manufacturer to submit an electronic waste management plan ("E-waste Plan") to the Department which, as discussed below, under the recently promulgated regulations, directs manufacturers to commit in detail to all facets of work needed to meet the E-waste Program.  The E-waste Law authorizes the imposition of a penalty of $1,000/day for each day that a manufacturer fails to submit an E-waste Plan.  Code § 16-427(d)(1).

42.    Although the E-waste Law does not specify the required methods to be used to collect, handle, and recycle or reuse CEE, it provides that "methods shall be **convenient** for residents of the city." Code § 16-423(d) (emphasis added).

43.    The E-waste Law prohibits, regardless of the circumstances, a manufacturer from imposing any fee or charge whatsoever on a person or entity to collect, handle, and recycle or reuse CEE, with the sole exception of for-profit businesses having more than 50 employees. Code § 16-423(c).

44.    A manufacturer must collect and accept its own CEE brand products, regardless of whether the owner/generator of the obsolete product is purchasing another product in exchange, and regardless of the circumstances under which the product was originally sold.  A manufacturer must accept any CEE product on a one-to-one basis with the resident's purchase of the same type of CEE, regardless of the brand name or origin.  Thus, a manufacturer of only small televisions will be required, at the time it sells one of those televisions, to collect, manage, and recycle or reuse in accordance with the E-waste Program any size and any brand television offered by a resident at the manufacturer's sole cost and expense.  (Plaintiff ITI raised this issue in comments it submitted on the DSNY's E-waste Rules when they were first proposed, but no relief or clarification was provided in the final rules.)  This obligation extends to "orphan waste," where the original manufacturer is known but no longer in business, or where the original manufacturer cannot be identified or no longer exists.  Code § 16-422(c).

45.    Beginning July 1, 2011, a manufacturer must retrieve on demand from a City resident all CEE of the same type sold by the manufacturer, including orphan waste, without a purchase event.  Thus, as the law is drafted, if a manufacturer ever assembled, manufactured, or imported a type of CEE that happened to be sold in the City, it will have the obligation to collect

15

that same type of CEE even though it no longer assembles, manufactures, or imports the CEE. Significantly, wholesalers, distributors, and/or retailers that actually held title to these now orphan products and, in almost every instance, actually transported the products into New York City for subsequent sale to consumers, will have no responsibility whatsoever for "orphan waste" under the City's E-waste Program. Code § 16-422(d).

46.    Under the E-waste Law, a manufacturer is subject to a penalty of $2,000 for each piece of CEE or orphan waste not accepted pursuant to its E-waste Plan. Code § 16-427(d)(4).

47.    Although the Department is not responsible financially or otherwise for collecting the CEE and orphan waste under the law, the City Council authorized the Department to apply the amount of CEE and orphan waste collected by manufacturers towards achieving the Department's recycling goals. Code § 16-430.

48.    The E-waste Law also requires the manufacturer to "attain the performance standards" under the E-waste Law. The performance standards require a manufacturer to "collect" annually a minimum percentage of its average annual sales of CEE, by weight. By July 1, 2012, a manufacturer is required to collect 25% of its average annual sales, by weight, in the City; by July 1, 2015, the standard is raised to 45%; and by July 1, 2018, a manufacturer is required to collect 65% of its average annual sales, by weight, in the City. Code § 16-424.

49.    The performance standards do not take into account that manufacturers do not have any ability to compel a resident's participation in a manufacturer's plan or otherwise control how or when a person in the City discards CEE. Nevertheless, the E-waste Law imposes severe penalties upon a manufacturer that does not meet the required performance standards. A manufacturer will be subject to a $50,000 penalty for each percentage point that the manufacturer falls below the performance standard. Code § 16-427(d)(5).

**C.** **The Sanitation Department Ignored Concerns Regarding the E-waste Law's Potential Burdens in its Rule-Making**

50.     The Plaintiffs and other stakeholders worked diligently and in good faith with the City following the passage of the E-waste Law to encourage the implementation of a workable program, and in particular to address the law's mandate for a recycling scheme that would be "convenient" for City residents.

51.     During the intervening period between the enactment of the E-waste Law and the issuance of proposed implementing regulations by the Department, representatives of Plaintiffs CEA and ITI reached out on numerous occasions to City and Department officials to express their concerns over the law's unprecedented breadth and scope. This included in-person meetings, as well as numerous phone calls and email exchanges.

52.     During a phone call that occurred on July 21, 2008, Plaintiff ITI pointed out to a City official the City's acknowledgement of the untenable costs for collecting electronic equipment directly from residences, citing the following text on the Department's website:

> WHY DOESN'T NEW YORK CITY COLLECT ELECTRONIC EQUIPMENT FROM OUR HOMES? WHY DOESN'T THE CITY HOLD MORE ELECTRONICS RECYCLING EVENTS AND WHY AREN'T THESE EVENTS CLOSER TO MY HOME?
>
> Electronics comprise only .64% (or 1.24% when including appliances) of New York City's residential waste stream (See What's in NYC's Waste?). **Due to high labor and transportation costs, it is cost prohibitive to collect these items directly from homes.** The DSNY Bureau of Waste Prevention, Reuse and Recycling tries to hold electronics events at convenient locations throughout the City. **However, it is very difficult to find venues for these events that provide enough space and are easily accessible for everyone.** Additionally, there are various other donation or recycling outlets available for electronics, including many manufacturer and retailers take-back programs, community group collections, and charitable organization donation programs.

*See* http://home2.nyc.gov/html/nycwasteless/html/recycling/electronicsfaq.shtml (visited July 17, 2008) (emphasis added).

53. During the call, Plaintiff ITI emailed a link to this website page to the City official.

54. By July 28, 2008 (within a week of the July 21, 2008 conversation), this language had been removed from DSNY's website page. *See* http://home2.nyc.gov/html/nycwasteless/html/recycling/electronicsfaq.shtml (last visited July 28, 2008).

55. DSNY drew these conclusions regarding the prohibitive costs of collecting electronics from City residents despite its extensive infrastructure, operational expertise, and resources. DSNY has been in existence for over 125 years and touts itself as "the world's largest [sanitation department], collecting over 12,000 tons of residential and institutional refuse and recyclables a day." DSNY Website, http://www.nyc.gov/html/dsny/html/about/about.shtml (last visited July 23, 2009). DSNY has approximately 10,000 employees, nearly 8,000 of which are uniformed sanitation workers and supervisors. DSNY serves the City out of 59 Districts, using approximately 5,700 vehicles.

56. DSNY is among the largest and most experienced waste collection and management organizations in the world, yet the City now seeks to impose obligations on Plaintiffs with respect to CEE that the DSNY publicly conceded were cost-prohibitive and impractical.

**D.     The Department of Sanitation Issues Proposed E-Waste Law Regulations**

57. On or about September 16, 2008, the Department published proposed rules to implement the E-waste Law. Among other things, the proposed rules defined "convenient

collection" to require manufacturers to directly collect from residents any CEE that exceeded 10 pounds in weight.

58.     At a public hearing held on the proposed rules, Carmen Cognetta, then-counsel to the Sanitation Committee of the New York City Council, testified to certain concerns the City Council had with respect to the Department's proposed regulations:

> And we have a couple of concerns.  One of them deals with the convenience standard.  As you know, in the law it says the return has to be convenient.  We went back and forth on this.  In the law, we actually had residential pick-up.  It was in the law at one point, and they took that out for convenience.... I think the section is going to require a little more thought and more conversation, perhaps, between the manufacturers and the City and perhaps the Council.

59.     Unfortunately, despite CEA, ITI, and manufacturers' best efforts to engage City and Department officials in a meaningful dialogue on a workable approach, that "conversation" never occurred.

60.     Many stakeholders, including CEA, ITI, ITAC, Retail Industry Leaders Association, Consumers Electronics Retailers Coalition, American Electronics Association and 3M, submitted written comments on the proposed rules.

61.     CEA and ITI raised numerous technical problems with the rules, but both stressed the concerns their members had with the E-waste Program as a whole, and in particular, the insurmountable costs and logistical nightmare that would result from the proposed mandate to collect CEE from residences.

62.     Plaintiff ITAC Systems informed the Department that because of its small size—7 employees, $1.5 million in annual sales, 10,000 to 12,000 units sold per year—the Department should consider an exemption for "very small domestic manufacturers" from the E-waste Program's requirements.  No such exemption was included in the final rules.

63.     The Retail Industry Leaders Association ("RILA") commented that "[t]he proposed plan would . . . negatively impact traffic, congestion, and parking problems in the city." RILA also stated that the proposed rules will result in the closing of businesses, the loss of significant sales tax revenue, and most importantly in these tough economic times, the loss of significant numbers of retail jobs—making retail stores E-waste dumps.

64.     The Consumer Electronics Retailers Coalition ("CERC"), whose membership includes companies such as BestBuy, Target and RadioShack,  commented that the "proposed rules will impose impossible, unrealistic, and extra-legislative burdens on consumers, retailers, and manufacturers." CERC explained that the excessive burdens imposed by the Proposed Rules eventually filter down as increased costs to consumers, which runs completely counter to the E–waste Law's goal of "minimiz[ing] costs to consumers of electronic equipment."  CERC further noted that the "timing could not be worse.  The national and New York economy is in bad shape." CERC submitted a news analysis that reported a "sharp drop in consumer spending and its effect on retailers," where "electronics are identified as among the weakest categories."

65.     The American Electronics Association ("AeA") commented that the proposed rules fail to allow for flexibility and failed to "take into consideration other successful, and equally convenient electronic recycling programs, such as mail-back programs, retail exchanges, and recycling events."

66.     3M Company ("3M") noted that certain pointing devices are used by the physically disabled, which are small volume and low weight, and as a result the volume sold in New York City would be less than the initial $1,500 registering fee and the $1,250 annual fee assessed under the E-waste Program.  For this reason, 3M requested the Department add a small volume exclusion to the E-waste Program.  3M's request was ignored.

**III.    *Final E-waste Rules Fail to Correct Major Problems in Proposed Rules***

67.    On April 15, 2009, DSNY finalized the E-waste Rules. *See* Chapter 17 of Title 16 of the Rules of the City of New York (16 RCNY § 17-01, *et seq.*).

68.    The Department largely ignored the comments that were submitted when the rules were proposed. As finalized, the E-waste Rules impose a draconian interpretation of the requirement of "convenience" in recycling and mandate direct retrieval of waste over fifteen pounds regardless of the manufacturer's lack of any commercial ties to the equipment. The rules therefore go beyond the E-waste Law by imposing a direct collection requirement for these items, as well as by excluding from the program additional electronic equipment that contain the same materials as equipment covered under the program that the City alleges poses environmental risks.

69.    The E-waste Rules require that a manufacturer submit a proposed E-waste Plan (*i.e.,* the electronic waste management plan) by June 15, 2009 (which was extended to July 31, 2009). 16 RCNY § 17-03(a). As discussed below, this requirement became far more onerous when the Department released a 43-page plan submission package that manufacturers are required to use to submit their E-waste Plans.

70.    In addition to the electronic items excluded by the City Council under the E-waste Law, the Department has now arbitrarily excluded video game systems; global positioning system ("GPS") devices, marine equipment, digital video recorders, cash registers, portable DVD players, digital picture frames, certain audio equipment and universal serial bus devices. 16 RCNY § 17-01. Some of these newly exempted items contain the same materials of concern that items of CEE contain, including small amounts of lead, mercury, and cadmium.

71.    The E-waste Rules provide that "convenient" collection for small items fifteen pounds or less is a mail-back program and/or a drop-off program. If a manufacturer elects to

offer only a drop-off program for such items, the manufacturer must provide at least 59 drop off locations throughout the City.  16 RCNY § 17-03(h)(2)(i)(A).

72.     For "large items" over fifteen pounds, manufacturers must provide direct collection (the "Direct Collection" requirement).  Direct Collection requires manufacturers to retrieve the CEE directly from a person's residence upon demand and at no charge.  16 RCNY § 17-03(h)(2)(i)(B).  For businesses, government offices, or not-for-profit corporations (except for for-profit businesses with more than 50 full-time employees), manufacturers must provide, upon demand and at no charge, services to collect and/or accept CEE that "must be at least reasonably accessible."  16 RCNY § 17-03(h)(2)(ii).

73.     The E-waste Rules prohibit a person from leaving CEE on the curbside, in contrast with the current practice of Defendant DSNY.  The Direct Collection requirement imposes a burden on the consumer as well as the manufacturer in that he or she will have to arrange with a manufacturer for pick up, and depending on the person's circumstances, may be required to be physically present when the CEE is picked up.  Multiple requests from residents in a single apartment building or on a single residential block, made at different points of time, will in most instances require multiple vehicle trips by different responsible manufacturers.

74.     The final rules establish the Direct Collection threshold at over 15 pounds, up from 10 pounds in the proposed rules.  However, this minimal change in the weight threshold has little to no impact on the overall costs of a direct collection program.  Even with a 15 pound weight threshold,  almost all televisions and desk top computers in New York City will exceed the "small item" threshold.  This will result in the Plaintiffs and other manufacturers directly collecting an estimated 1.3 million televisions, computers, other covered electronic equipment in New York City, totaling over 47.9 million pounds per year.

75.     Consistent with the E-waste Law, the E-waste Rules require manufacturers to
provide all materials necessary for mail back, drop-off, or collection completely free of charge.
16 RCNY § 17-03(h)(2)(ii).  This obligation could typically require, free of any charge, a
delivery of the packaging materials separate and apart from the Direct Collection of the CEE,
which not only burdens the manufacturers, but also potentially the resident as well, while adding
traffic to the City's streets and contributing to air pollution and carbon-dioxide emissions.

### E.     The Final Rules and Subsequent Mandates of Defendant DSNY Make Compliance With the Plan Submission Deadline Impossible

76.     The E-waste Rules, which were only finalized on April 15, 2009, obligate
manufacturers to use Department-issued submission materials to prepare an E-waste Plan.  This
43-page packet was only released and posted on DSNY's website on or about the same time the
E-waste Rules were finalized.  The commitments and information mandated by the Department
are onerous and unduly burdensome, especially considering the short time within which
manufacturers must prepare and submit the E-waste Plans..

77.     The final E-waste Rules initially specified a deadline of June 15 to submit these
plans.  On June 4, the Department extended the deadline to July 31, a mere 6-week reprieve.

78.     The E-waste Plan submission materials consist of five separate sections as well as
instructions, comprising 43 pages in total.  The materials are lengthy, cumbersome, and
complicated, and require detailed information about, among other things (i) the manufacturer's
brands, (ii) its brand categories, (iii) the manner in which the company qualifies as a
manufacturer under the law for each brand, (iv) the types of CEE under each brand name, (v)
dates the brands and/or products were sold, (vi) three years of sales data (by weight) for each
type of CEE sold in the City, (vii) the methods used by the manufacturers to collect New York
City specific sales data, (viii) a description of the means by which the manufacturer sells or has

sold CEE and the categories of persons to whom they are or were sold, (ix) a description of how the manufacturer intends to inform the public of its plan including point of sale information, (x) full contact and other information of each party performing the manufacturer's collection and/or transportation operations, with an organization verification, (xi) detailed information on mail back service to be provided, (xii) detailed information on drop-off service to be provided, including information on permanent and non-permanent drop-off sites, and (xiii) detailed information on how Direct Collection will be performed.

79.     The E-waste Plan must also include detailed information regarding the persons or entities that would be recycling or processing for reuse the covered electronic equipment, including the start and end dates of contracts with these entities, and descriptions of environmental, health, or safety audits that a recycling facility has undergone.

80.     The final E-waste Rules also now incorporate Local Law 21's performance standards to recycle specific volumes of waste, which Defendant Bloomberg vetoed and stated were unconstitutional.  Specifically, a manufacturer's E-waste Plan must describe "how the manufacturer intends to achieve the performance standards set forth in § 16-424 of the Administrative Code."  16 RCNY § 17-03(h)(9).

81.     Because manufacturers must undertake a significant, time consuming process and make material decisions that will impact the company's finances, structure, contractual commitments, and operations before such information can be assembled, the Department's mandate and expectation that manufacturers submit complete E-waste Plans by July 31, 2009, is excessively burdensome, illegal, and unconstitutional.

82.     The E-waste Plan submission materials issued on or around the time the E-waste Rules were finalized expand the requirements of the E-waste Law and the E-waste Rules and are

ultra vires and unconstitutional. For example, Section P.1.c., entitled "Statement of Joint Responsibility," not only requires two more manufacturers to indicate joint responsibility for the same brand, but the manufacturer must also "indicate the party assuming **sole responsibility** for the brand." (emphasis added).

83.     Many brands have multiple manufacturers associated with them (certainly as New York City has defined that term). For example, one company may "assemble" the product; another company may "own" and "license" the product brand name to another company; and another company may "import" the product. Similarly, different companies may have been associated with a brand of products at different times. Expecting these entities to determine and state which of them should be "solely responsible" under the E-waste Program for a specific brand in New York City before July 31, 2009, violates due process and other constitutional protections and is flatly illegal.

**IV.     The Department Failed to Consider Adverse Environmental Impacts Associated with the E-waste Rules and E-waste Program as Required by State and City Law.**

84.     Under Section 16-432 of the E-waste Law, Defendant DSNY is granted the discretion to promulgate rules to implement the new E-waste Program. When the Department exercised its discretion to promulgate rules to implement the E-waste Law, it was legally mandated to consider potential adverse environmental impacts associated with the proposed rules before finalizing them. DSNY did not do so and should be enjoined from implementing the E-waste Program until the required environmental reviews are completed.

85.     When the City Council enacted the E-waste Law, it issued a "negative declaration" pursuant to SEQRA and CEQR, meaning that the City Council did not undertake any environmental review of the E-waste Law. However, while the E-waste Law called for "convenient" collection of CEE, it did not mandate "Direct Collection" of "large" CEE. In fact,

as discussed above, Carmen Cognetta, then-counsel to City Council's Sanitation Committee, and the individual who executed the City Council's negative declaration, stated on the record when DSNY first proposed the E-waste Rules that the City Council considered but ultimately decided not to include a "Direct Collection" obligation on the E-waste Law. Thus, environmental impacts associated with the "Direct Collection" mandate and "large" (15 pounds) CEE threshold have never been assessed.

86.     SEQRA mandates that all state and local governmental agencies assess the environmental effects of their discretionary actions. The State Legislature adopted SEQRA with the express intent that "the protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations in public policy" and that SEQRA's policies, statutes, and regulations should be implemented "to the fullest extent possible." ECL § 8-0103 (6), (7). (SEQRA's implementing rules are found at 6 NYCRR Part 617, which were promulgated by the New York State Department of Environmental Conservation ("NYSDEC")).

87.     Strict compliance with SEQRA's procedural mandates is required so that agencies will err on the side of meticulous care in their environmental review and to ensure that they do not cut corners at the ultimate expense of the environment. Substantively, agencies must take a "hard look" at all relevant areas of environmental concern. This substantive assessment includes the obligation to evaluate "reasonable alternatives to the action which **would achieve the same or similar objectives**." *See* 6 NYCRR 617.9(f)(5) (emphasis added). The purpose of requiring consideration of reasonable alternatives to a proposal is to aid the public and governmental bodies in assessing the relative costs and benefits of the proposal.

88.     New York City has adopted procedures, known as the City Environmental Quality Review ("CEQR"), for implementing SEQRA.  *See* Title 62 of the Rules of the City of New York, Chapter 5 (62 RCNY 5-01 *et seq.*).  The CEQR rules explain that they "shall apply to environmental review by the city that is required by [SEQRA and its implementing regulations] and shall not be construed to require environmental quality review of an action where such review would not otherwise be required by such act and regulations, or to dispense with any such review where it is otherwise required."  62 RCNY 5-02(d).

89.     The City has also issued a "CEQR Technical Manual" which makes it clear that an "exercise of discretion by the agency" such as the "adoption of regulations" triggers the obligation to conduct an environmental review.

90.     DSNY failed to comply with either SEQRA or CEQR in adopting and implementing the E-waste Rules, failed to consider environmental impacts associated with the mandates of the program and rules, failed to consider reasonable alternatives that would cause fewer environmental impacts while achieving the same or better results than the approach mandated by the DSNY E-waste Rules and the E-waste Program as a whole.

91.     In exercising its discretion in promulgating its E-waste Rules, in particular its mandate for "Direct Collection" of all covered electronic equipment in excess of 15 lbs (and the possibility that many Direct Collection events could  necessitate at least two truck trips through the streets of New York City – one for the mandated delivery of packing materials and one for the equipment pick-up), DSNY failed to give any consideration to the additional truck traffic and traffic congestion caused by the E-waste Rules, E-waste Program, and the Direct Collection requirement in particular, failed to consider the additional noise impacts caused by additional truck traffic and traffic congestion caused by DSNY's E-waste Rules, E-waste Program, and the

Direct Collection requirement, and failed to consider the exacerbated local air quality impacts and increased greenhouse gas emissions caused by the DSNY's E-waste Rules, E-waste Program, and the Direct Collection requirement.

92.    The addition of private truck fleets, in addition to the existing DSNY fleet of trucks and vehicles, to the streets of New York City to collect "large" CEE will add to traffic congestion, cause increased noise impacts to City residents, decrease local air quality due to emissions from these trucks and contribute to greenhouse gas emissions, collectively causing a further erosion of the quality of life of the residents of New York City.

93.    Defendant DSNY failed to comply with any of SEQRA/CEQR's procedural mandates to ensure that potential environmental impacts are adequately considered and the public is informed and has an opportunity to review and comment on any conclusions drawn with respect to environmental impacts, and on efforts to minimize such impacts through mitigation measures and adoption of the alternative with least impact on the environment.

94.    Defendant DSNY never prepared an environmental assessment form ("EAF"), never issued a significance determination as to whether further analysis was required, never prepared and issued an environmental impact statement ("EIS"), never provided for public review and comment, and never issued findings regarding potential environmental impacts, all of which are procedural requirement under SEQRA and CEQR.

95.    Upon information and belief, neither did Defendant DSNY comply with SEQRA by issuing a supplemental EIS to supplement the 2006 SWMP EIS and assess potential environmental impacts associated with the E-waste Rules or E-waste Program.

96.    Defendant DSNY also failed to comply with SEQRA's express notice and publication requirements under 6 NYCRR 617.12.

97.    Defendant DSNY failed take a "hard look" at the environmental consequences of the E-waste Program, including but not limited to the Direct Collection requirement, and assess whether reasonable alternatives could minimize such impacts.

98.    The failure to undertake an environmental review of these issues is striking given the increase in traffic congestion and related environmental impacts that will be caused by DSNY's Direct Collection requirement.  This requirement is in direct conflict with the stated purpose of the E-waste Law—namely to "help prevent air, water, and land pollution."  Local Law 13, Section 1.  Increasing the number of trucks as a result of the DSNY's Direct Collection requirement also conflicts with the City Council's intent to "encourag[e] convenient and **environmentally sound collection** of electronic waste[.]"  *Id.* (emphasis added).

99.    In a blatant post-decisional rationalization, DSNY attempted to paper over its failure to comply with SEQRA in an internal memorandum prepared by counsel to DSNY.  This internal memorandum was prepared on May 7, 2009 (the "DSNY Internal Memo") –three full weeks *after* the E-waste Rules were finalized.

100.    The DSNY Internal Memo contends that DSNY's adoption of the E-waste Rules constituted a "Type II" action and therefore was not subject to SEQRA's environmental review requirements.  Specifically, the DSNY Internal Memo contends that adoption of the rules constitutes a Type II action as either "routine or continuing agency administration and management, not including new programs or major reordering of priorities that may affect the environment" (6 NYCRR 617.5(c)(20)) or "adoption of regulations, policies, procedures and local legislative decisions in connection with any action on this [Type II] list." (6 NYCRR 617.5(c)(27).  The applicability of the latter depends entirely on the applicability of the former.

101.   DSNY contends that its adoption of the E-waste Rules, including its establishment of a 15-pound threshold and the Direct Collection mandate, is merely "routine or continuing agency administration and management" and does not include a new program that may affect the environment.  This contention is plainly wrong.  Such an interpretation would render all rulemaking activities exempt from SEQRA review as long as the rulemaking falls within the agency's broad legislative mandate.

102.   Further, such an interpretation is inconsistent with the City's own CEQR manual which states that the "adoption of regulations" does trigger the obligation to conduct an environmental review.

103.   It is also inconsistent with the SEQRA Handbook, which is prepared and updated by NYSDEC as a practical reference guide to achieve compliance with SEQRA.  The SEQRA Handbook is currently being revised; however, NYSDEC already has updated draft guidance with respect to the very provision DSNY relies upon to claim that its adoption of the E-waste Rules is an exempt Type II action.   It states in full:

> SEQR[A] does not apply to the *ordinary administration and continuing management of a governmental agency*.   It is when new actions are taken, or new programs are begun, that the environmental assessment must be done.
>
> This section includes activities such as:
> - decisions to relocate an office from one building to another,
> - entering into a contract to operate an existing facility,
> - setting tipping fees at a landfill,
> - providing funding for an existing agency to allow it to conduct current programs,
> - revising application/registration fees,
> - changing the operating hours of a public facility, and
> - the designation of a structure as a historic landmark.

http://www.dec.ny.gov/permits/39800.html (last visited July 1, 2009).  None of the cited examples is remotely comparable to DSNY's adoption of the E-waste Rules.

104.   The DSNY Internal Memo therefore reinforces DSNY's failure to comply with SEQRA and CEQR.

## V.   *Illegal and Unconstitutional Aspects of the E-Waste Program*

### A.   **The July 31 Deadline for Submission of E-waste Plans is Arbitrary and Unduly Burdensome**

105.   The Department published its final E-waste Rules on April 15, 2009. Manufacturers must prepare and submit these E-waste Plans using 43 pages of materials that were issued by the Department on or around the same time. These materials impose additional requirements beyond what is specified in the E-waste Law and E-waste Rules.

106.   Preparation of the E-waste Plans requires an enormous commitment of personnel, time, and resources by manufacturers. An extraordinary level of detail and advance decision-making is required to complete the Plan.

107.   The Department initially imposed a 60-day deadline for manufacturers to submit complete E-waste Plans.

108.   In an effort to avoid a direct confrontation with the City and Department over the legality of the E-waste Program and the imminent June 15 deadline for the submission of E-waste Plans, Plaintiffs ITI and CEA, on behalf of their membership, requested by letter dated May 22, 2009, that the Department "extend the June 15th deadline by 120 days so manufacturers can have a reasonable opportunity to fully understand the new rules' requirements and meet with City officials to address the legal and constitutional issues arising from the requirements."

109.   ITI and CEA explained that this extension would provide sufficient "time for the parties to engage in a constructive dialogue, rather than in an adversarial exchange."

110.   On June 4, the Department announced it would extend the deadline, but only by 6 weeks to July 31.

111.    The minimally extended deadline remains unduly burdensome and, for many, infeasible, and fails to account for the critical legal problems with the program.

**B.    The E-waste Program Discriminates and Imposes an Undue and Excessive Burden on Interstate Commerce, Lacks a Rational Basis, Violates Plaintiff's Constitutional Rights, Exceeds the City's Police Powers,  and Constitutes an Arbitrary and Capricious Exercise of Authority**

112.    The E-waste Program, on its face and as applied, is ultra vires and violates the constitutional rights of CEE manufacturers.  The burdens total hundreds of millions of dollars annually, substantially disrupt existing business practices, and target most heavily out-of-city manufacturers.  Moreover, the environmental benefits of the City of the E-waste Program are negligible and can be achieved through much more tailored means.

113.    Although the E-waste Program purports to regulate commerce in the City of New York only, the E-waste Program in fact has an extraterritorial reach that has the practical effect of controlling manufacturers' conduct beyond the boundaries of New York City.  Because of its discriminatory effect against manufacturers that lack facilities in the City to accommodate the collection process, a rule of *per se* illegality applies to the program under the dormant Commerce Clause. *See, e.g., Or. Waste Sys. v. Dep't of Envtl. Quality,* 511 U.S. 93 (1994).

114.    No out-of-state manufacturer can reasonably meet the minimum 59-drop off location requirement for "small" CEE without the commitment of enormous amounts of funds and other resources.  Similarly, an even greater level of funds and resources will be required for an out-of-state manufacturer to comply with the Direct Collection requirement for "large" items. The practical reality is that out-of-state manufacturers will have to rely solely on expensive third-party arrangements to comply with the law, whereas in-City manufacturers will have the option to commit, at lower cost, their own local personnel and resources to the effort.

115.   The program gives local manufacturers (those manufacturers with a physical presence in the City) a competitive advantage and drives up the costs for out-of-state manufacturers to sell their products to consumers.

116.   The E-waste Program also exceeds the authority of the City to regulate interstate commerce. The burdens imposed on interstate commerce far outweigh the local benefits to City Residents. These burdens include, but are not limited to (i) manufacturers' inability to finalize E-waste plans by the July 31 deadline, including their inability or difficulty in completing the City's forms or making the commitments (contractual and otherwise) required of them to be in a position to complete and submit the E-waste Plans by the imposed deadline; (ii) manufacturers' exposure to excessive and repeated penalties as a result of not being able to meet the procedural and substantive requirements of the E-waste Plan submission and the E-waste Program as a whole; (iii) the excessive costs imposed on manufacturers to comply with the E-waste Program; (iv) the logistical burdens, in terms of the temporary and permanent reallocation of personnel and resources in order to comply with the E-waste Program; (v) the consequential inability to commit resources elsewhere, such as toward additional employment and product development; (vi) the interference with current business practices, including forcing certain manufacturers to stop selling products lines or, even if practically feasible, stop selling those product lines in New York City; (vii) for brands that are associated with multiple manufacturers, forcing each to identify which manufacturer is "solely responsible" for the brand in its E-waste Plan submission; (viii) imposition of such burdens on manufacturers that they are forced to raise product prices across the board imposing the burdens of New York City's law to all consumers of electronics products, and not simply those consumers in the City; (ix) the creation of such an onerous program, making it virtually impossible for most if not all manufacturers to comply with the E-

waste Program, thereby exposing manufacturers not only to the imposition of penalties, but also the loss of business reputation, loss of good will, and loss of market share, among other things; (x) imposition of requirements that effectively rewrite prior and existing business arrangement and contracts.

117.    As discussed below, the New York City E-waste Program constitutes, by far, the most onerous and expensive electronics recycling mandate enacted to date in the United States, imposing costs that are 10 times more expensive than the total cost of collection and recycling of other E-waste programs in California and Maine.

118.    No consideration has been given to the burdens the E-waste Program places on companies that manufacture small CEE items for computer use, including manufacturers of custom devices for physically impaired people that allow them to use a computer. These latter items typically have extremely low sales volumes, with minimal, if any, profit margins.

119.    These manufacturers must comply with all of the E-waste Program's requirements, including the collection, management, recycling/reuse requirements, performance standard obligations, and filing fees, and be subject to enormous penalties if they fail to meet these requirements. Defendants City and DSNY could have exempted these small companies from these requirements, or at least minimized the burdens imposed on them, but they failed to do so. Thus, these companies are subject to the full panoply of the E-waste Program's requirements and enforcement measures.

120.    Upon information and belief, in many cases, for these companies, the registration fees alone will be greater than the cost of the items sold in New York City, and so there is no economic incentive to continue to sell there. A company might try to label products and tell distributors "not for sale in New York City," but, logistically, this would be an extraordinarily

difficult undertaking, and could have consequences for marketing these products in other locations. In any event, because the law is retroactive (discussed below), and because some products sold in other jurisdictions will ultimately be transported into the City by their owners and generated as obsolete there, a manufacturer is effectively trapped in the program. Thus, as long as a manufacturer at some point sold its products in the City and continues to do so elsewhere it is still subject to all of the law's requirements.

121. The E-waste Program also excessively burdens interstate commerce by requiring that manufacturers "provide information on how a person can return covered electronic equipment pursuant to such manufacturer's electronic waste management plan at the point of sale." Most CEE is sold through distributors at retail and not directly by electronic manufacturers. Manufactures have a limited role, if any, in the transaction between the CEE consumer and retailer and thus cannot guarantee that a retailer would provide the information mandated by the E-waste Law.

122. DSNY has publicly stated that even though manufacturers are required to educate consumers, at the point of sale, about how to return covered electronics, it "is important for retailers to work with manufacturers to ensure that customers are well informed about how to return electronic equipment." Similarly, DSNY also "encourages retailers to coordinate with manufacturers to provide drop-off service for covered electronic equipment since retail outlets represent a major avenue for the convenient collection of electronic equipment." *See* http://www.nyc.gov/html/nycwasteless/html/in_business/electronicslaw_reqs.shtml (last visited July 23, 2009). Yet, DSNY offers no means by which any of this can be accomplished because retailers are not regulated under the City's E-waste Program.

123.    The E-waste Program violates CEE manufacturers' equal protection and substantive due process rights by treating similarly situated companies differently and by failing to pursue more reasonable methods to achieve the goals of electronic waste recycling than requiring manufacturers to collect CEE, including the Direct Collection of large items of CEE. *Beatie v. City of New York*, 123 F.3d 707 (2d Cir. 1997). The program's requirements, including, but not limited to the Direct Collection and 59 drop-off location requirements, are arbitrary, lack any plausible rational basis, and are based on assumptions that the Department itself knows to be untrue.

124.    The program treats manufacturers of CEE differently than similarly situated manufacturers of other consumer electronics products and other bulk and special wastes, including appliances and mercury-containing equipment, that have similar potential risks, and therefore the program illegally discriminates against manufacturers of CEE.

125.    The E-waste Program, first through the law and then supplemented through the Department's rules and July 31 submission requirements, excludes numerous electronics devices from the definition of CEE. These excluded items contain the same or similar substances of concern, including lead, mercury, and cadmium, that the City Council believed could affect the health, safety, and welfare of its citizens. Although these items contain the same substances, the City and the Department arbitrarily and without explanation excluded them from regulation.

126.    The City and the Department had no rational basis to distinguish between the CEE and these excluded items and the exclusion is not related to a legitimate governmental purpose.

127.    Bulk and special wastes other than electronic wastes also are treated differently than CEE. For example, DSNY collects, at curbside, for disposal and/or recycling refrigerators,

freezers, air conditions, dehumidifiers, water coolers, and other appliances that contain chlorofluorocarbons ("CFCs"). The Department has dedicated personnel, vehicles, and facilities for this purpose. These appliances are far larger and heavier than CEE, yet residents are required to bring these used appliances to the curbside for collection. By contrast, CEE manufacturers are required to collect used CEE greater than 15 pounds directly from residents' homes.

128.    Upon information and belief, these appliances (*e.g.,* washers, dryers, refrigerators, air conditioners, etc.) contain potentially hazardous or toxic materials such as heavy metals (*e.g.,* lead, hexavalent chromium, mercury, cadmium), brominated flame retardants, and polychlorinated biphenyls (*i.e.,* PCBs).

129.    Upon information and belief, despite these constituents, neither the City nor DSNY imposes any restrictions or requirements on itself or any vendors and service providers receiving these used appliances to address these potentially hazardous or toxic constituents, and imposes no obligations on manufacturers of such products at the end of their useful life.

130.    For used tires and other special waste like motor oil, fluorescent light tubes, transmission oil, thermostats, motor oil filters and latex paint, DSNY maintains a small number of dedicated sites in the City at which to collect these items at designated times. Upon information and belief, manufacturers of these products have no collection, management, or recycling/reuse responsibilities or obligations under City law.

131.    The E-waste Program targets companies around the world whose electronic goods may some day follow the stream of commerce to New York City. The program does not limit its application to CEE purchased within the City or purchased by a person within the City at the time. Rather, it imposes a duty upon a manufacturer to collect, handle, and recycle or reuse any CEE, purchased anywhere, that any person in the City requests the manufacturer to retrieve. The

excessive burdens also stem from the fact that the program regulates the conduct of
manufacturers far beyond the territorial boundaries of the City of New York. This
extraterritorial reach violates the Dormant Commerce Clause and Due Process Clause and
exceeds the police powers granted to it by the State of New York.

132.    Defendants' imposition of joint and several and retroactive liability on
manufacturers and an obligation to accept orphan waste constitutes a violation of manufacturers'
constitutional rights under the Due Process, Contracts, and Takings Clauses of the United States
Constitution.

133.    If a manufacturer ever assembled, branded, licensed, manufactured, or imported a
type of CEE, it will have the obligation to collect that same type of CEE even if it no longer
assembles, brands, licenses, manufactures, or imports that type of CEE or any CEE.

134.    The E-waste Program retroactively and fundamentally alters the terms of the
original contract of sale for a CEE between the manufacturer and the consumer (or distributor,
retailer, etc. as the case may be). Prior to the enactment of the E-waste Program, a manufacturer
sold the CEE for a certain price, relying on the fact that the manufacturer was permanently
transferring full title and it would not be required to take title to the product again at the end of
its useful life. The sales price of the CEE at that time could not have reflected the cost to collect,
handle, and recycle or reuse the CEE. Manufacturers could not have reasonably foreseen that
they would be required to take back unwanted used products when they entered into the business
and began assembling, manufacturing, or importing CEE.

135.    The obligation under the E-waste Program for a manufacturer to take back CEE
sold years ago, at no cost to the consumer, goes well beyond individual residents of the City, and

extends to not-for-profit corporations, associations, governmental entities, public benefit corporations, or public authorities, and for-profit businesses with 50 employees or less.

136.   The retroactive application of the E-Waste Program effectively turns what was a contract for sale of a good into a lease agreement in violation of the Due Process, Contracts, and Takings Clauses of the United States Constitution.

137.   The program's illegal underpinnings are further exemplified by the manufacturer's obligation to collect, manage, and recycle/reuse orphan waste.  Unlike their former or unidentified competitors, current manufacturers never owned, controlled, or profited from these orphan brands.

138.   Other entities that do, or at least did, have a legal nexus to those orphan products are the major wholesalers, distributors, and retailers that legally owned them, distributed them (often across state lines), and sold them to consumers in exchange for payment and presumably at a profit.  These entities, however, have no responsibilities under the E-waste Program. Requiring current manufacturers to bear the entire financial burden of orphan waste is excessively burdensome, illegal, and violates the Due Process, Contracts, and Takings Clauses of the United States Constitution.

**C.   No Other E-waste Program Imposes Burdens on Manufacturers that the New York City E-waste Program Does**

139.   New York City is the only municipality that has enacted E-waste programs. Nineteen  states – California, Connecticut, Hawaii, Illinois, Indiana, Maine, Maryland, Michigan, Minnesota, Missouri, New Jersey, North Carolina, Oklahoma, Oregon, Rhode Island, Texas, Virginia, Washington, and West Virginia currently have electronics recycling and take back legislation in place.  These programs vary in their degree of burdens imposed on the industry, and in particular on manufacturers.

140.   However, none of these other programs remotely approaches the burdens with respect to costs and resources necessary to comply with a program that the City seeks to impose through the E-waste Program.

141.   For example, the State of California imposes a fee on purchasers of new covered devices, referred to as the Standard Statewide Combined Recovery and Recycling Payment Rate. This fee finances state payments to collectors and recyclers in California for their services. Since 2004, the cost of the program has declined, and from September 2008 to present the rate charged was $0.39 per pound. This fee covers all costs associated with the program, from collection through transportation, consolidation, and recycling. Importantly, all of the costs of the program are internalized to the State of California.

142.   Similarly, data from the first two years of the electronics recycling program in Maine, which is considered one of the more burdensome programs (at least until now) establishes that the average costs of the program were approximately $0.33 per pound.

143.   By contrast, the Direct Collection portion of the E-waste Program by itself, just for the collection of the CEE, is conservatively estimated to cost approximately $3.27 per pound. This estimate does not include costs to transport, consolidate, and recycle/reuse the CEE.

144.   Thus, once the full costs of the New York City E-waste Program is considered, it will cost literally 10 times more than the take-back programs in California and Maine. The European Union ("EU") has also created a regime that governs the management and recycling of obsolete electronics, including in cities comparable to New York such as London, Paris, Berlin and Rome. And yet the EU program does not require manufacturers to retrieve used electronic products directly from end users in these major metropolitan areas. Rather, the EU's Waste

Electrical and Electronic Equipment ("WEEE") Directive imposes explicit collection obligations on distributors of electronic equipment, which are defined to include retailers.

145.    In sharp contrast to the New York City E-waste Program, when retailers in the EU sell a covered product to a residential customer in the EU, WEEE requires retailers to offer free take-back of a similar product.

## FIRST CAUSE OF ACTION

### Dormant Commerce Clause—42 U.S.C. § 1983

146.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 145 of the Complaint, as if fully set forth herein.

147.    Electronic equipment products are articles in commerce subject to the sole power of Congress to regulate commerce among the several states under the Commerce Clause of the United States Constitution.

148.    The Commerce Clause provides that only "[t]he Congress shall have the Power ... [t]o regulate Commerce . . .  among the several States . . . ." Art. I, § 8, cl.3.  Likewise, the Commerce Clause bars state or local governments from unjustifiably discriminating against or burdening the interstate flow of articles of commerce.

149.    The E-waste Program exceeds the authority of the City of New York to regulate or burden interstate commerce.  Although the E-waste Program purports to regulate commerce in the City of New York only, the E-waste Program in fact has an extraterritorial reach that has the practical effect of controlling manufacturers' conduct beyond the boundaries of City.

150.    The burdens imposed on interstate commerce as a result of the E-waste Law, E-waste Rules, and E-waste Program outweigh the local benefits to City residents.

151.   The E-waste Law, E-waste Rules, and E-waste Program, collectively, also violate the Commerce Clause due to their discriminatory effect on out-of-state manufacturers that have no physical presence in New York City.

152.   At all times, Defendants acted under color of state law.

153.   Defendants' enactment of the E-waste Law, E-waste Rules and E-waste Program deprived the Plaintiffs of their rights under the Commerce Clause of the United States Constitution, in violation of 42 U.S.C. § 1983, and these Plaintiffs are entitled additionally to damages and attorneys' fees.

154.   Plaintiffs will suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Law, E-waste Rules, and E-waste Program.

## SECOND CAUSE OF ACTION

### Equal Protection—42 U.S.C. § 1983

155.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 154 of the Complaint as if fully set forth herein.

156.   The E-waste Program treats manufacturers of CEE differently than similarly situated manufacturers of other bulk and special wastes (such as appliances and mercury-containing equipment) that have similar components, thereby discriminating against manufacturers of CEE.

157.   The E-waste Program treats manufacturers of CEE differently than similarly situated manufacturers of electronic equipment excluded from the definition of CEE, even though many contain identical components, including trace amounts of lead, mercury, and cadmium, thereby discriminating against manufacturers of CEE.

158.    The E-waste Program treats manufacturers of CEE that never owned or controlled orphan waste differently than companies who actually held title to these goods but are arbitrarily excluded from regulation and retroactive liability under the program.  The E-waste Program treats manufacturers of CEE differently than all other entities in the stream of commerce and distribution of these products.

159.    At all times, Defendants acted under color of state law.

160.    Defendants' enactment, promulgation, and implementation of the E-waste Law, E-waste Rules, and E-waste Program have deprived the Plaintiffs of their rights to equal protection of the laws as guaranteed by the United States and New York State Constitutions, in violation of 42 U.S.C. § 1983, and these Plaintiffs are entitled additionally to damages and attorneys' fees.

161.    Plaintiffs will suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Law, E-waste Rules, and E-waste Program.

### THIRD CAUSE OF ACTION

### Substantive Due Process—42 U.S.C. § 1983

162.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 161 of the Complaint, as if fully set forth herein.

163.    The financial, environmental, and other costs to comply with the E-waste Program are greatly disproportionate to the ends sought to be achieved. Defendants failed to consider more reasonable methods to achieve the goals of electronic waste recycling than requiring manufacturers to collect CEE, including the Direct Collection of CEE weighing more than 15 pounds.

164.    The obligation of manufacturers to bear the burdens of the E-waste Program alone, including the burden of providing for Direct Collection of large items of CEE, is arbitrary and irrational, lacks any plausible rational basis, and/or is based on facts which could not reasonably be conceived to be true by the Department.  Accordingly, the E-waste Rules and the E-waste Program, and in particular the Direct Collection requirement, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

165.    The E-waste Program is retroactive in that it imposes new liability on manufacturers for past transactions.  The mandate to take back CEE (including orphan waste that the manufacturer never owned or controlled) purchased prior to the enactment of the E-waste Law and the promulgation of the E-waste Rules is arbitrary and irrational, lacks any plausible rational basis, and/or is based on facts which could not reasonable be conceived to be true by the City or Department.  Accordingly, the retroactive liability of the E-waste Law, E-waste Rules, and E-waste Program violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

166.    The short time frame for compliance with the E-waste Rules – less than four months – is arbitrary and irrational, lacks any plausible rational basis, and/or is based on facts which could not reasonable be conceived to be true by the Department.  Accordingly the time frame for compliance with the E-waste Rules separately violates the Due Process Clause of the United States Constitution.

167.    At all times, Defendants acted under color of state law.

168.    Defendants' enactment and promulgation of the E-waste Law, E-waste Rules, and E-waste Program deprived the Plaintiffs of their rights to due process as guaranteed by the

United States Constitution, in violation of 42 U.S.C. § 1983, and these Plaintiffs are entitled additionally to damages and attorneys' fees.

169.    Plaintiffs will suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Law, E-waste Rules, and E-waste Program.

## FOURTH CAUSE OF ACTION

### Regulatory Takings—42 U.S.C. § 1983

170.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 169 of the Complaint, as if fully set forth herein.

171.    The Takings Clause of the Fifth Amendment of the United States Constitution provides: "Nor shall private property be taken for public use, without just compensation."

172.    The purpose of the Takings Clause is to prevent the government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole.

173.    The E-waste Program applies retroactive liability on a manufacturer by requiring a manufacturer to accept for return CEE it previously assembled, manufactured, or imported, as well as CEE its competitors assembled, manufacturer, or imported and orphan waste.

174.    The E-waste program imposes an unforeseen and substantial financial burden on all manufacturers, including manufactures that no longer assemble, manufacture, or import CEE.

175.    At all times, Defendants acted under color of state law.

176.    Defendants' enactment and promulgation of the E-waste Law, E-waste Rules, and E-waste Program deprived the Plaintiffs of their rights under the Taking Clause of the United States Constitution, in violation of 42 U.S.C. § 1983, and these Plaintiffs are entitled additionally to damages and attorneys' fees.

177.   Plaintiffs will suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Law, E-waste Rules, and E-waste Program.

## FIFTH CAUSE OF ACTION

### Violation of Contracts Clause—42 U.S.C. § 1983

178.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 177 of the Complaint, as if fully set forth herein.

179.   The United States Constitution prohibits any state, or subdivision thereof, from passing a law "impairing the Obligation of Contracts." U.S. Const. Art. I, § 10.

180.   Defendants, by enacting the E-waste Law and promulgating the E-waste Rules, substantially impaired and changed the contracts for a sale of goods between manufacturers and the purchasers. The mandate to take back CEE purchased prior to the enactment of the E-waste Law and the promulgation of the E-waste Rules is not reasonable or appropriate for Defendants' intended purpose.

181.   At all times, Defendants acted under color of state law.

182.   Defendants' enactment and promulgation of the E-waste Law, E-waste Rules and E-waste Program deprived the Plaintiffs of their rights under the Contracts Clause of the United States Constitution, in violation of 42 U.S.C. § 1983, and these Plaintiffs are entitled additionally to damages and attorneys' fees.

183.   Plaintiffs will suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Law, E-waste Rules, and E-waste Program.

## SIXTH CAUSE OF ACTION

### Violation of the State Environmental Quality Review Act/City Environmental Quality Review

184.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 183 of the Complaint, as if fully set forth herein.

185.    When a City agency undertakes a discretionary action such as a rulemaking, it must comply with the mandates of SEQRA and CEQR to ensure that environmental impacts of the proposal are adequately considered.

186.    "Strict compliance" with SEQRA's procedures are required.  Additionally, agencies must take a "hard look" at all relevant areas of environmental concern, including but not limited to an evaluation of reasonable alternatives to the action that would achieve the same or similar objectives.  Before an agency may make a final determined on a proposed action that is subject to an environmental impact review under SEQRA and CEQR, that agency must "certify that consistent with social, economic and other essential considerations from among the reasonable alternatives available, the action is one that avoids or minimizes adverse environmental impacts to the maximum extent practicable, and that adverse environmental impacts will be avoided or minimized to the maximum extent practicable by incorporating as conditions to the decision those mitigative measures that were identified as practicable." 6 NYCRR 617.11(d).

187.    Upon information and belief, the E-waste Rules and E-waste Program implemented through the E-waste Rules, were subject to review under SEQRA and CEQR before they could be finalized.

188.    Upon information and belief, the E-waste Rules and E-waste Program implemented through the E-waste Rules, in particular the Direct Collection requirement, will

cause environmental impacts that Defendants failed to review and consider before the E-waste Rules were finalized.

189.   Upon information and belief, Defendants failed to strictly comply with SEQRA/CEQR's procedural mandates, including but not limited to their notice and publication requirements.

190.   Upon information and belief, Defendants failed to take a "hard look" at environmental impacts associated with the E-waste Program, including the Direct Collection requirement, and failed to evaluate less environmentally harmful alternatives that could achieve the same or similar goals.

191.   Upon information and belief, Defendants failed to make the required findings and certification at the end of the SEQRA process prior to finalizing the E-waste Rules.

192.   Defendants have therefore violated SEQRA (ECL § 8-0101, *et seq.*), its implementing regulations (6 NYCRR Part 617) and CEQR (62 RCNY 5-01 *et seq.*).

193.   As a result of Defendants' failure to comply with SEQRA's and CEQR's requirements, Plaintiffs have suffered and will continue to suffer immediate and irreparable harm if Defendants are permitted to implement and enforce the E-waste Rules and E-waste Program.

194.   Accordingly, Plaintiffs seek a declaration that the E-waste Rules and E-waste Program are invalid and seek an injunction against their implementation and enforcement.

## SEVENTH CAUSE OF ACTION

### Administrative Violations (N.Y. C.P.L.R. Article 78 Standard)

195.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 194 of the Complaint, as if fully set forth herein.

196.    DSNY's promulgation of the E-waste Rules is affected by an error of law, is arbitrary and capricious, and lacks any rational basis.

197.    Plaintiffs have been harmed by the DSNY's arbitrary and capricious actions and will continue to be harmed until the E-waste Rules are enjoined.

198.    Plaintiffs hereby request this Court to enter an order determining that the actions of the DSNY were arbitrary and capricious and lacked any rational basis, and thereby invalidating, canceling, and annulling the E-waste Rules and the E-waste Program as a whole to the extent it relies on the E-waste Rules or the mandated E-waste Plan materials.

## EIGHTH CAUSE OF ACTION

### Extraterritorial Exercise of Police Power

199.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 to 198 of the Complaint, as if fully set forth herein.

200.    Article IX, section 2(c) of the New York State Constitution enables local governments to enact laws to protect the health and well-being of persons or property *therein*. (Emphasis added.)  Section 2(d) of Article IX prohibits a local government from enacting a law that "impair[s] the power of any other local government."

201.    New York Municipal Home Rule article 2 section 10(1)(ii)(a)(12) similarly authorizes a local government to enact local laws relating to such "government, protection, order, conduct, safety, health and well-being of persons or property *therein*" (emphasis added), including local laws "providing for the regulation or licensing or occupations or businesses."

202.    In addition, New York General Municipal Law article 5, section 80 prohibits a local government from enacting a law that discriminates against non-residents.

203.    The E-waste Law, E-waste Rules, and E-waste Program as a whole are an impermissible use of Defendants' police power.

204.    The Department's mandate for Direct Collection is not reasonably necessary to achieve the purpose of the E-waste Law, is unduly oppressive, and is arbitrary and capricious.

205.    The E-waste Program significantly affects activities of manufacturers of CEE outside of the City's borders and seeks to regulate out-of-state manufacturers' activities beyond the City's border.

206.    As set forth above, the E-waste Program discriminates against out-of state manufacturers.

207.    Plaintiffs have been harmed by Defendants' actions and will continue to be harmed by Defendants' actions until the E-waste Law, E-waste Rules, and E-waste Program are enjoined.

208.    Accordingly, Plaintiffs seek a declaration that the E-waste Law, E-waste Rules, and E-waste Program are an invalid exercise of the Defendants' police power and seek an injunction against the implementation and enforcement of the E-waste Law, E-waste Rules, and E-waste Program.

## **RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants pursuant to 42 U.S.C. § 1983 and pendent New York State claims, as follows:

(1) Enjoining Defendants from enforcing the July 31, 2009 deadline with respect to the submission of E-waste Plans;

(2) Declaring that New York City Local Laws 13 and 21 and their implementing regulations are unconstitutional under the Commerce Clause and the Equal Protection Clause;

(3) Declaring that New York City Local Laws 13 and 21 and their implementing regulations violate Plaintiffs' due process rights;

(4) Declaring that the E-waste Rules are arbitrary and capricious and have no rational basis;

(5) Declaring that New York City Local Laws 13 and 21 and their implementing regulations exceed New York City's police power authority;

(6) Declaring that New York City Local Laws 13 and 21 and their implementing regulations were enacted in violation of the State Environmental Quality Review Act and the City Environmental Quality Review requirements;

(7) Preliminarily and permanently enjoining Defendants from implementing and enforcing New York City Local Laws 13 and 21 and their implementing regulations;

(8) Awarding Plaintiffs damages in an amount to be determined at trial and their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws;

(9) Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  July 24, 2009
        New York, New York

                          Respectfully submitted,

                          BEVERIDGE & DIAMOND, P.C.

                          By: _____
                             Michael G. Murphy (MM 5472 )
                             Megan R. Brillault (MB 5562)
                             477 Madison Avenue, 15th Floor
                             New York, NY 10022
                             T: (212) 702-5400
                             F: (212) 702-5450
                             mmurphy@bdlaw.com
                             mbrillault@bdlaw.com

                             *Attorneys for Plaintiffs Consumer Electronics
                             Association, Information Technology Industry
                             Council, and ITAC Systems, Inc.*

*Of counsel*:

        James B. Slaughter (*pro hac vice* admission pending)
        Nadira Clarke (*pro hac vice* admission pending)
        1350 I Street, N.W., Suite 700
        Washington, D.C. 20005
        T: (202) 789-6040
        F: (202) 789-6190
        jslaughter@bdlaw.com
        nclarke@bdlaw.com